UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---------------------------------------------------X

BHP BILLITON MARKETING INC.,

08  CV  0533

             Plaintiff,

ECF CASE

  - against -

JEBSENS TRANS-PACIFIC SHIPPING SERVICE
AS BERGEN NORWAY a/k/a JEBSENS
TRANS-PACIFIC SHIPPING SERVICES AS
and KRISTIAN JEBSENS REDERI AS,



            Defendants.

---------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, BHP BILLITON MARKETING INC. (hereafter referred to as "Plaintiff"), by

and through its attorneys, Lennon, Murphy, and Lennon, LLC, as and for its Verified Complaint

against the Defendants, JEBSENS TRANS-PACIFIC SHIPPING SERVICE AS BERGEN

NORWAY a/k/a JEBSENS TRANS-PACIFIC SHIPPING SERVICES AS ("JTPS") and

KRISTIAN JEBSENS REDERI AS, ("KJR")(collectively referred to as "Defendants"), alleges,

upon information and belief, as follows:

    1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this

matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et. seq.*,

and this Court's federal question jurisdiction, 28 United States Code § 1331.

    2.     At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized and operating under foreign law.

3.    Upon information and belief, Defendant JTPS, was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law.

4.    Upon information and belief, Defendant KJR was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was, and still is, at all material times the alter-ego of JTPS.

5.    Upon information and belief, KJR is an operator of sea going vessels and is involved in the carriage and delivery of bulk cargoes by sea.

6.    On or about September 8, 2006, Plaintiff and Defendant JTPS entered into a Contract of Affreightment whereby JTPS agreed to supply a sea going vessel to Plaintiff to carry a shipment of sulphur cargoes from Vancouver, British Columbia to "Townsville and/or Adelaide and/or Esperance 1 safe berth in Charterers' option." *Please find attached hereto as Exhibit "1" a copy of the Contract of Affreightment (hereinafter "COA")*. The Plaintiff exercised its Options to extend the COA. The second Option was exercised on the 13th August 2007 thus extending the COA to 31st December 2008. *Please find annexed hereto as Exhibit "2" the e-mail confirming the extension of charter party.*

7.    The Plaintiff and JTPS agreed to apply the following freight rates for the tonnage as per below:

Freight (basis free in/out)
USD$41.10 pmt to Townsville
USD$43.20 pmt for Adelaide
USD$43.10 pmt for Townsville & Adelaide
USD$49.10 pmt for Townsville & Esperance USD$49.10 pmt for Adelaide & Esperance

8.    Plaintiff had the option of declaring Esperance only liftings at the following rates:

| 15,000 +/-5% CHOPT | USD$47.40 pmt |
| 25,000+/-5% CHOPT | USD$44.75 pmt |
| 28,000+/-5% CHOPT | USD$41.90 pmt |

2

9.      JTPS nominated the M/V "GENERAL VILLA," "GENERAL DELGADO" or the "M/V CICLOPE" to perform the carriage of the cargo contemplated by the COA.

10.     On December 20, 2007 JTPS informed the Plaintiff that due to the present high market rates compared with the rates agreed upon in the COA, it would not provide the Vessel nominated for the January shipment to Plaintiff under the terms previously agreed and expressed inability to perform the COA as a whole on the basis of the applicable rates. *Please find letter from Defendant annexed hereto as Exhibit "3."*

11.     JTPS thus repudiated and/or anticipatorily breached the COA.

12.     Plaintiff accepted JTPS' anticipatory breach and/or repudiation of the COA in respect of the January shipment on December 25, 2007, reserving all of its rights to claim the losses/damages arising therefrom and in general to claim losses/damages resulting from the repudiation of the entire COA.

13.     Plaintiff took steps to mitigate its damages and entered into a charter for a substitute vessel, the "POS LEADER," to carry the cargo.

14.     However, as result of JTPS' anticipatory breach and/or repudiation of the COA, as best as may be reasonably approximated, Plaintiff still sustained damages in the total principal amount of $2,058,300.00, in respect of the January shipment only, exclusive of interest, arbitration costs and attorney's fees resulting from the difference in freight rates under the COA and the substitute charter party. *See invoice and calculation annexed hereto as Exhibits "4" and "5" respectively.*

15.     The COA provides that "the parties shall seek to resolve any dispute or claim

3

arising out of or in relation to [the] Contract by friendly discussion. Any party may notify the other Party of its desire to enter into consultation to resolve a dispute or claim by mutual agreement."

16.    The COA further provides that if no settlement can be reached, the dispute shall then be submitted for arbitration as per Clause 55 of the Charter Party.

17.    Pursuant to the COA, if settlement cannot be reached, all disputes arising thereunder are to be submitted to arbitration in London with English Law to apply.

18.    The Plaintiff and JTPS held a meeting to attempt to resolve the dispute on January 8, 2008, however a mutually acceptable agreement could not be reached.

19.    Thus, in consequence of JTPS' failure to pay its damages, Plaintiff is preparing to commence arbitration under the COA.

20.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in arbitration pursuant to English Law. As best as can now be estimated, Plaintiff intends to claim the following amounts:

| | | |
|---|---|---|
| A. | Principal claim: | $2,058,300.00 |
| B. | Estimated interest on claims:<br>3   years at 8%, compounded quarterly | $553,255.33 |
| C. | Estimated attorneys' fees and arbitration<br>costs/expenses: | $500,000.00 |
| **Total** | | **$ 3,111,555.33** |

21.    Plaintiff reserves its right to amend the complaint to include additional damages incurred as a result of JTSS's actions, including but not limited to, those incurred due to the differential rates of demurrage in the COA and the substitute charter and/or in respect of the non performance/repudiation of the remainder of the COA and/or the corresponding shipments.

22.    Upon information and belief, Defendant JTPS is a shell-corporation through which Defendant KJR conducts its business.

23.    Upon information and belief, Defendant JTPS has no separate, independent identity from Defendant KJR.

24.    Defendant KJR is the alter-ego of Defendant JTPS because it dominates and disregards JTPS' corporate form to the extent that KJR is actually carrying on JTPS' business and operations as if the same were its own, or vice versa.

25.    Upon information and belief, Defendant KJR uses Defendant JTPS as its "chartering arm" or as a "pass through" entity such that it can insulate itself from creditors relating to its commercial obligations and in particular its vessel charters/contracts of affreightment.

26.    Upon information and belief, JTPS is controlled by KJR, a holding entity for the majority of interests of Norwegian shipping magnate Atle Jebsen and his sons, one of which is Bjorn Jebsen.

27.    Upon information and belief, JTPS is one of several companies which are operated, controlled and managed as a single economic enterprise known as the "JEBSENS GROUP" and/or the "KJR GROUP" which is ultimately controlled by Mr. Atle Jebsen.

28.    Upon information and belief, Defendants JTPS and KJR have the exact same registered address: Sandbrugaten 5, Bergen, 5003, Norway.

29.    Furthermore, upon information and belief, JTPS and KJR have the exact same contact details. Both JTPS and KJR use the following phone and facsimile numbers respectively: 47 53 05 00 00 and 47 53 05 00 51.

30.     In addition, upon information and belief, Defendants JTPS and KJR have over-lapping directors.

31.     Upon information and belief, both Bjorn Jebsen and Atle Jebsen sit on both boards of directors.

32.     Furthermore, upon information and belief, KJR and JTPS have overlapping managers.

33.     Upon information and belief, both KJR and JTPS utilize the exact same managers: Salve Sandvik and Michael Oliver Ross.

34.     Upon information and belief, JTPS has no employees of its own (outside of the managers above) and another company owned/controlled by KJR (Jebsens Management AS), manages all controlling activities at JTPS.

35.     Upon information and belief, KJR owns 100% of the shares in JTPS.

36.     Furthermore, upon information and belief, Mr. Atle Jebsen owns 100% of the stock of KJR, while also sitting on KJR's and JTPS's board of directors.

37.     Upon information and belief, JTPS has little equity and is undercapitalized.

38.     Upon information and belief, JTPS' "profit" is effectively transferred to KJR.

39.     Upon information and belief, KJR uses JTPS to "hold" contracts to ship dry bulk cargo from the US West Coast to Australia without proper consideration.

40.     Based on the foregoing, as well as other activities, KJR and JTPS should be considered as a single economic unit with no corporate distinction between or among them, rendering each liable for the debts of the other, and all assets of KJR susceptible to attachment and/or restraint for the debts of JTPS.

41.   By virtue of the foregoing, KJR is properly considered a party to the subject contract as the alter ego and/or prime mover and controller of Defendant JTPS.

42.   In the further alternative, Defendants are partners and/or joint venturers such that KJR is now, or will soon be, holding assets belonging to JTPS, or vice versa.

43.   In the further alternative, Defendants are affiliated companies such that KJR is now, or will soon be, holding assets belonging to JTPS, or vice versa.

44.   The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendants.

45.   The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendants held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendants, and to secure the Plaintiff's claim as described above.

WHEREFORE, Plaintiff prays:

A.   That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.   That the Court retain jurisdiction to compel the Defendant(s) to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.     That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendants, in the amount $3,111,555.33 calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D.     That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court.

E.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.     That this Court award the Plaintiff its attorneys' fees and costs of this action; and

G.     That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: New York, NY
       January 22, 2008

                                        The Plaintiff,
                                        BHP BILLITON MARKETING INC.


                                        By: _____
                                            Patrick F. Lennon (PL 2162)
                                            Nancy R. Peterson (NP 2871)

LENNON, MURPHY & LENNON, LLC
The Gray Bar Building
420 Lexington Ave., Suite 300
New York, NY 10170
Phone (212) 490-6050
Fax (212) 490-6070
pfl@lenmur.com
nrp@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York )
             )    ss.:    City of New York
County of New York )

1.    My name is Nancy R. Peterson.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:     New York, NY
            January 22, 2008

_____
Nancy R. Peterson

# EXHIBIT "1"

# CONTRACT OF AFFREIGHTMENT
### DATED 8th September 2006

## SHIPMENT OF SULPHUR CARGOES

# ORIGINAL

## PREAMBLE

This Contract entered into on the 8th day of September 2006 between **BHPB Freight Pty Ltd** as agents for and on behalf of **BHP Billiton Marketing Inc** ("Charterers") and Jebsens Trans-Pacific Shipping Services AS Bergen, Norway ("Owners"). It is agreed that transportation will be performed subject to the terms and conditions of this Contract, which includes this Preamble, the "BHPVOY 2005" charter party, and other rider clauses attached herewith.

### BASE CONTRACT TERMS

### 1    Shipment Period

The term of this Contract shall be for 6 Months firm (1 January 2007 to 30 June 2007) with a further 6 months (1 July 2007 to 31 December 2007) in CHOPT to be declared by April 1st 2007, with a further optional 1 year in CHOPT (1 January 2008 to 31 December 2008) which shall be declareable by October 1st, 2007..

### 2.    VESSELS & SERVICE
### 2.1    Vessel

Owner confirms vessel is suitable in all respects for above trade

Owners responsibility to ensure the vessel satisfies all load and discharge port restrictions and regulations, including all Australian Quarantine requirements.

Vessel to be fully ITF and ISSC compliant

Vessels to be max 15yrs with min 25mt cranes (and if vessel is grab fitted charterer has ability to utilise for loading and discharging free of charge)

Owners have the liberty to use the following 3 vessels, with owners to pay max London Lloyds over age premium.
- m.v General Villa - gantry - built 1985
- m.v.General Delgado - gantry - built 1985
- m.v. Ciclope - craned - built 1985

Vessel nomination to be subject to Rightship Vetting Assessment and shippers / receivers approval declarable within 2 working days after receipt of official nomination on charterer's pro forma vessel nomination and fully completed Rightship vetting questionnaire.

2

3.    SCHEDULING AND TONNAGE

Annual Tonnage: 120,000mt - 200,000mt +/- 10% CHOPT
Shipment sizes: 5000mt to 20,000mt +/- 5% CHOPT
Sulphur to be shipped as full or part cargo in owners option
Shipment sizes to be declared / confirmed on nomination of laycans

Charterers to nominate a 7 day laycan at least 25 days prior to the first day of the laycan.  For
Esperance only lifting's Charterers to give 45 days notice of required laycan, Owners to
nominate a performing vessel or substitute latest 14 days prior to first day of laycan with actual
performing vessel to be nominated/declared latest 7 days prior to opening of lay days.

Vessel nomination to be subject to Rightship Vetting Assessment and shippers / receivers
approval declarable within 2 working days after receipt of official nomination on charterer's pro
forma vessel nomination and fully completed Rightship vetting questionnaire.

Charterers shall provide a 6-month period tentative shipping schedule which to be tentatively
updated on a monthly basis

4.    LOADING AND DISCHARGING PORTS AND TERMS
       LOADING (See Charter Party Clause 8 and 10)

The vessel shall proceed to and load at Vancouver BC: 1 or 2 safe berth in Chopt(s), always
afloat or in Charterers option Port Moody: 1 or 2 safe berth(s), in Chopt always afloat or in
Charterers option Vancouver BC 1 safe berth and Port Moody 1 safe berth in Chopt, always
afloat.

All time and costs for preload vessel inspections for owners account

The cargo shall be loaded at the average rate of 12,000 metric tons per weather working days of
24 consecutive hours Sundays local and national holidays always included (SHINC).

Notice of Readiness (NOR) may be tendered on any day, at any time Sundays Holidays included
(SHINC), whether in free pratique or not, whether in berth or not. With 12hrs turn time, unless
sooner commenced, where actual time used to count.

DISCHARGING (See Charter Party Clause 9 and 11)

At each discharging port charterers required discharge berth always to be used.

The vessel shall proceed to and discharge at Townsville and/or Adelaide, and/or Esperance 1 safe
berth in Charterers' option, with discharge always in geographical rotation and always afloat.

Townsville

The cargo shall be discharged at the average rate of 4,500 metric tons per weather working days
of 24 consecutive hours Sundays local and national holidays always excluded, unless used where
actual time used shall count (SHEX ULJ)

3

Notice of Readiness (NOR) may be tendered on any day, at any time Sundays Holidays included (SHINC), whether in free pratique or not, whether in berth or not. With 12hrs turn time, unless sooner commenced, where actual time used to count.

### Adelaide

The cargo shall be discharged at the average rate of 4,500 metric tons per weather working days of 24 consecutive hours Sundays local and national holidays always excluded, unless used where actual time used shall count (SHEX UU)

Notice of Readiness (NOR) may be tendered on any day, at any time Sundays Holidays included (SHINC), whether in free pratique or not, whether in berth or not. With 12hrs turn time, unless sooner commenced, where actual time used to count.

### Esperance

The cargo shall be discharged at the average rate of 8,000 metric tons per weather working days of 24 consecutive hours Sundays local and national holidays always included (SHINC).

Notice of Readiness (NOR) may be tendered on any day, at any time Sundays Holidays included (SHINC), whether in free pratique or not, whether in berth or not. With 12hrs turn time, unless sooner commenced, where actual time used to count.

5.   FREIGHT RATE (USD per metric ton) (see also C/p clause 3,4 and 5)

5.1   Freight rates for firm period 1 Jan 07 to 30 Jun 07 & CHOPT optional period 1 July 07 to 31 Dec 07

a) Owners and Charterers have agreed to apply the following freight rates for the tonnage as per below:

Freight (basis free in/out)
USD$41.10 pmt for Townsville
USD$43.20 pmt for Adelaide
USD$43.10 pmt for Townsville & Adelaide
USD$49.10 pmt for Townsville & Esperance USD$49.10 pmt for Adelaide & Esperance

Charterers have the option to declare Esperance only liftings:

| | |
|---|---|
| 15,000mt +/- 5 % CHOPT | USD$47.40 pmt |
| 25,000mt +/- 5 % CHOPT | USD$44.75 pmt |
| 28,000mt +/- 5 % CHOPT | USD$41.90 pmt |

b) Owners have the liberty to use the following 3 vessels, with owners to pay max London Lloyds over age premium:

- M.v. General Villa - gantry - built 1985
- M.v. General Delgado - gantry - built 1985
- M.v. Ciclope - craned - built 1985

4

Freight (basis free in/out)
USD$39.10 pmt for Townsville
USD$41.20 pmt for Adelaide
USD$41.10 pmt for Townsville & Adelaide
USD$47.10 pmt for Townsville & Esperance USD$47.10 pmt for Adelaide & Esperance

5.2    Freight rates for optional period 1 Jan 08 to 31 Dec 08

a) Owners and Charterers have agreed to apply the following freight rates for the tonnage as per below:

Freight (basis free in/out)
USD$42.55 pmt for Townsville
USD$44.75 pmt for Adelaide
USD$44.65 pmt for Townsville & Adelaide
USD$50.65 pmt for Townsville & Esperance
USDS50.65 pmt for Adeladie & Esperance

Charterers have the option to declare the option for Esperance only liftings:

15,000mt +/- 5 % CHOPT    USD$48.95 pmt
25,000mt +/- 5 % CHOPT    USD$45.95 pmt
28,000mt +/- 5 % CHOPT    USD$43.45 pmt

b) Owners have the liberty to use the following 3 vessels, with owners to pay max London Lloyds over age premium
- M.v. General Villa - gantry - built 1985
- M.v. General Delgado - gantry - built 1985
- M.v. Ciclope - craned - built 1985

Freight (basis free in/out)
USD$40.65 pmt for Townsville
USD$42.75 pmt for Adelaide
USD$42.65 pmt for Townsville & Adelaide
USD$48.65 pmt for Townsville & Esperance
USD$48.65 pmt for Adeladie & Esperance

5.3    Alternative Cargoes and Load/Discharge Ports

Subject to Owners agreement on scheduling, laydays and port rotations, freight differentials for other cargoes and/or loading and/or discharging ports and cargo rate combinations other than that of Sulphur as agreed above, are to be calculated on the basis of the proforma vessel below to give the same timecharter equivalent of US$17,000 per day as the voyage USWC (Longbeach/Vancouver BC range) to Australian Ports (basis freight for Sulphur). Owner to calculate timecharter equivalent freight rates for other loading or discharging port(s) basis different port costs and load/discharge terms (which will be provided on a case by case basis) at any time during the period of this contract upon request from the Charterer.

5

Pro-forma vessel's particulars:

DWT 28,500MT
DRAFT 9.70 M SSW
TPC 35.0 MT
SPEED (BALLAST/LADEN) 14.0/13.5 KNOTS
CONSUMPTION BALLAST/LADEN(MT) 21.0 / 23.0 (380cst)
IN PORT CONS. (MT) 2.5 (380cst) IFO per day & 0.5 MDO per port.

Bunker price to be based upon Vancouver Washington Platts for calculation purposes
Alternative cargo to be carried to always be within Owners (Jebsens Transpac vessels) Cargo and Trading
exclusions
All other terms and conditions (i.e. scheduling & nominations etc) as per agreed Sulphur terms
conditions.


6    BUNKER ESCALATION

No bunker escalation.


7    DEMURRAGE / DESPATCH  (See Charter Party clause 15)

Demurrage USD$15,000 Per Day & Despatch USD$7,500 Per Day, both ends.

8 .   DISPUTE RESOLUTION

The parties shall seek to resolve any dispute or claim arising out of or in relation to this Contract
by friendly discussion. Any party may notify the other Party of its desire to enter into consultation
to resolve a dispute or claim by mutual agreement.

If no settlement can be reached, the case in dispute shall then be submitted for arbitration as per
Clause 55 of the Charter party.


9    GOVERNING LAW

This Contract will be subject to English Law and jurisdiction.


10    ASSIGNMENT

Owner shall not assign or transfer any of its rights or obligations hereunder nor sub contract nor
delegate the whole or any part of this contract without the prior consent of the Charterer.

6

IN WITNESS WHEREOF, the Parties have caused this agreement to be executed by their duly authorised officers on the date of the year as shown above.

**EXECUTED** by **BHPB Freight Pty Ltd** as )
agents for and on behalf of **BHP Billiton** )
**Marketing Inc,** by its duly authorised )
representative: )

)
..................................  )
Signature    For and on behalf of )
          BHPB FREIGHT PTY LTD )

....NIGEL....  CORSEN )
Name (block letters) )

**EXECUTED** by **OWNERS** Jebsens Trans- )
Pacific Shipping Services AS Bergen by its )
duly authorised representative: )

)
....................................  )
Signature )
   For and on behalf of )
   Jessens Trans-Pacific Shipping )
...S. Services AS Bergen...ee )
Name (block letters) )

JEBSENS INTERNATIONAL (AUSTRALIA) PTY LTD )
AS AGENTS ONLY



## VOYAGE CONTRACT (2005)

| | |
|---|---|
| **1. Place and Date**<br><br>Melbourne 6th September 2005 | |
| **2. Owner and Place of Business**<br><br>Jebsens Trans-Pacific Shipping Services AS Bergen Norway | **3. Charterer and Place of Business**<br><br>BHPB Freight Pty Ltd as agents for and on behalf of BHP Billiton Marketing Inc |
| **4. Vessel's Name**<br><br>Jebsens TBN | **5. Flag and Age**<br><br>TBN |
| **6. Vessel's Desc. otherwise as per Appendix A**<br>Jebsens TBN | **7. Itinerary**<br><br>TBN |
| **8. Loading Port(s)**<br><br>See Preamble clause 4 | **9. Discharge Port(s)**<br>Townsville: 1 safe berth, always afloat<br>Adelaide: 1 safe berth, always afloat<br>Esperance: 1 safe berth, always afloat<br>Also refer to Preamble Clause 4 |
| **10. Full and complete/Part Cargo and Quantity**<br>AS PER PREAMBLE CLAUSE 3 | **11. Laycan Commencement / Cancelling**<br>Refer to preamble clause 1 |
| **12. Freight Rate**<br>AS PER PREAMBLE CLAUSE 5<br><br><br>*Free in and free out and spout trimmed* | **13. Laytime for Loading Port(s)**<br><br>AS PER PREAMBLE CLAUSE 4 |
| **14. Demurrage / Despatch**<br>USD$15,000 / USD$7,500 pro rata per thereof | **15. Laytime for Discharge Port(s)**<br>AS PER PREAMBLE CLAUSE 4 |
| **16. Turn Time Load Port(s)**<br>12 Hours, USC IUATUTC | **17. Turn Time Discharge Port(s)**<br>12 Hours, USC IUATUTC |
| **18. NOR at Load Port(s)**<br>ATDN SHINC, WIBON WIPON | **19. NOR at Discharge Port(s)**<br>ATDN SHINC, WIBON WIPON |
| **20. Agents at Load Port (s)**<br>Charterers | **21. Agents at Discharge Port(s)**<br>Charterers |
| **22. Address Commission**<br>3.75% | **23. Brokerage**<br>Nil |

*Delete italics where appropriate.*

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Contract attached. In the event of a conflict of conditions, the provisions of this face page note shall prevail over those in the Contract attached overleaf.

| Signature (Owner(s)) | Signature (Charterer(s)) |
|---|---|
| For and on behalf of<br>Jebsens Trans-Pacific Shipping.<br>Services AS Bergen<br>JEBSENS INTERNATIONAL (AUSTRALIA) PTY LTD<br>AS AGENTS ONLY | For and on behalf of<br>BHPB FREIGHT PTY LTD |

1  1.  It is this day mutually agreed between the party mentioned in Box 2 as Owner/Disponent Owner/ Time Charter
2.     Owner (hereinafter called Owner) of the Vessel named in Box 4, classed Lloyds + 100 A1 (or equivalent at a
3      classification society that is a member of the International Association of Classification Societies), described in
4      Box 5 & 6 and further detailed per Appendix A and the party mentioned in Box 8 as Charterer that

5  2.  The said Vessel being warranted tight, staunch, strong and in every way fitted for the voyage, shall after delivery of
6      her previous cargo, proceed with all convenient speed to the loading port(s) or place (s) stated in Box 8 and there
7·     load always afloat as directed by Charterer or its designated representatives, cargo as stated in Box 10, not
8      exceeding what she can reasonably stow and carry and being so loaded, shall with all convenient speed proceed
9      to the discharging port(s) or place(s) stated in Box 9 and there deliver the cargo, always afloat as directed by
10     Charterer or their designated representatives,

11     Cargo is always to be loaded, carried and discharged in accordance with the rules and requirements of IMO.

12  3. **Freight Rate**
13     Freight, inclusive of all port charges, pilotages, light dues and all other dues usually paid by Vessel, shall be paid
14     at the rate stated in Box 12.

15  4. **Initial Freight Payment**
16     Charterer shall pay freight on Bill of Lading/Custom weight in United States Dollars to Owner's account as per
17     Appendix B.

18     95 percent of Bill of Lading quantity shall be paid within five (5) banking days of signing and releasing freight
19     prepaid / freight payable as per contract, at Charterer's Option, Bills of Lading.

20     Discountless and nonreturnable whether Vessel and/or cargo is lost or not lost.

21     The balance of freight, together with settlement of despatch and/or demurrage if applicable, shall be paid within
22     seven (7) days after right and true delivery of the cargo and tender of time sheets, Statement of Facts and signed
23     Notice of Readiness with Owner's calculations of any demurrage or despatch incurred at the loading and
24     discharging ports,

25  5. **Settlement of Balance of Freight/Demurrage**
26     Freight shall be finalised on the basis of the Bill of Lading/Custom quantity and the balance of freight shall be
27     settled as per Clause 4.

28  6. **Bills of Lading**
29     The Master shall authorise the agents at load port to sign and release on his behalf three negotiable Bills of Lading
30     or non-negotiable Seaway Bills if requested by Charterer, at any time Charterer's or Shipper's request this for any
31     quantity loaded up to that time. Shipper's weights in accordance with the shore scales/belt/weighbridge/draft
32     survey (in Charterer's exclusive option) at the loading port shall be accepted as bona fide accepted and Mate's
33     Receipts shall be drawn up accordingly. Bills of Lading or Seaway Bills are always to be drawn up in conformity
34     with the Mate's Receipts. Upon completion of loading Owner shall release three negotiable Bills of Lading or non
35     negotiable Seaway Bills, caused "Freight Prepaid" or at Charterer's option "Freight Payable as per Contract", to
36     Shippers or their representatives.

37  7. **Laydays and Cancellation**
38     Time for loading shall not commence before "Laycan Commencement" as per Box 11,

39     Charterer shall have the right to cancel this Contract or at its option the voyage in question should there be any
40     material misrepresentation made by Owner in respect of the Vessel's particulars, the Vessel's suitability to perform
41     the voyage, the Vessel's position and/or itinerary or should the Vessel not have tendered Notice of Readiness in
42     accordance with Clause 10 on or before the "Laycan Cancelling" as per Box 11.

43  8. **Loading Terms**
44     The cargo shall be loaded at the average rate stated in Box 13 per weather working day of 24 consecutive hours.
45     Time shall not count for opening and closing of hatches at commencement and completion of loading at each port,
46     even if Vessel is on Demurrage.

47  9. **Discharging Terms**
48     The cargo shall be discharged at the average rate stated in Box 15 per weather working day of 24 consecutive
49     hours. Time shall not count for opening and closing of hatches at commencement and completion of discharge at
50     each port, even if Vessel is on Demurrage,

51  10. **Tendering of Notice of Readiness at Load Port(s)**
52     Notice of Readiness (NOR) at load port shall be tendered in writing by facsimile, email or courier, to
53     Charterer/Charterer's agent only as per Box 19 after the Vessel has arrived and is in all respects ready and in free
54     pratique (relevant contact details to be provided on fixture). If the loading berth or anchorage is unavailable at this
55     time the Vessel may tender NOR from the normal recognised waiting place designated by the Port Authority, even
56     if outside the normal port limits and whether or not the Vessel has been cleared by customs and/or quarantine
57     authorities.

58     At load port, Owner/Master are not to tender, nor is Charterer obliged to accept, Vessel's NOR prior to
59     commencement of laycan, unless otherwise previously agreed. At Loadport, owner/master is able to tender, but

2

charterers are not obliged to accept vessels NOR prior to commencement of laycan, unless otherwise
previously agreed.

60    Time for loading shall count as stated in Box 19 after NOR has been tendered and accepted by Charterer.

61    In the event that Charterer or Shippers can arrange to load before time commences to count, Master shall allow
62    work to be done, in which case half actual time used to count. Time used by the Vessel in proceeding from waiting
63    place or anchorage to loading berth or anchorage and making ready for loading (including obtaining customs
64    clearance and pratique) and any time lost before berthing (after tendering NOR) due to delay to the Vessel, shall
65    not count as laytime or time on demurrage unless such delay is directly caused by action of Charterer.

66    11.    Tendering Notice of Readiness at Discharging Port(s)
67    Notice of Readiness (NOR) at discharge port shall be tendered in writing by facsimile, email or courier, to
68    Charterer/ Charterer's agent only as per Box 19 after the Vessel has arrived and is in all respects ready and in free
69    pratique (relevant contact details to be provided in future). If the discharging berth or anchorage is unavailable at
70    this time the Vessel may tender NOR from the normal recognised waiting place designated by the Port Authority,
71    even if outside the normal port limits and whether or not the Vessel has been cleared by customs and/or
72    quarantine authorities.

73    Time for discharging shall count as per Box 17 after NOR has been tendered and accepted by Charterer to
charterers / charterers agents. However

74    In the event that Charterer or Shippers can arrange to discharge before time commences to count, Master shall
75    allow work to be done, in which case half actual time used shall count. Time used by the Vessel in proceeding
76    from waiting place or anchorage to discharging berth or anchorage and making ready for discharging (including
77    obtaining customs clearance and pratique) and any time lost before berthing (after tendering NOR) due to delay to
78    the Vessel, shall not count as laytime or time on demurrage unless such delay is directly caused by action of
79    Charterer.

80    12.    Laytime at Additional Ports
81    At the second (and subsequent) loading and/or discharging port(s) the Vessel shall tender NOR and laytime or
82    time on demurrage shall resume counting as per Clauses 10 and/or 11. Time counting at the second (and
83    subsequent) loading and/or discharging port(s) shall always be subject to the exceptions specified in Clause 8
84    and/or 9.

85    13.    Shifting Cost and Time
86    If more than one berth or anchorage at any loading and discharging port has been agreed, shifting costs including
87    bunkers consumed shall be for Owner's account. Time so used shall not count as laytime or time on demurrage.
Shifting time between berths when shifts required to continue or complete, loading or discharging cargo
being carried under this COA to count as laytime

88    14.    Warping
89    The Vessel shall move along any one berth or installation, as reasonably required by Charterer or Terminal
90    Operator, solely for the purpose of making any hatch or hatches available to the loading or discharging facilities at
91    the berth or installation. All costs onboard the Vessel including bunkers shall be for Owner's account. Time used
92    for warping shall not count as laytime or time on demurrage and warping to be done by Vessel's crew, where local
93    regulations permit.

94    15.    Demurrage and Despatch
95    Demurrage at the rate specified in Box 14 for laytime exceeded in loading and/or discharging shall be paid by
96    Charterer. Despatch at the rate specified in Box 14 for laytime saved in loading and/or discharging shall be paid by
97    Owner. Settlement shall be in accordance with Clause 4. Laytime shall be non-reversible.

98    16.    Overtime
99    All overtime expenses at loading and discharging port(s) shall be for account of the party ordering the overtime. If
100    overtime is ordered by port authorities or the party controlling the loading or discharging terminal or facility, such
101    expenses shall be for Charterer's account. Overtime expenses for the Vessel's officers and crew shall always be
102    for Owner's account.

103    17.    Stevedoring
104    Provided the cargo is not being loaded or discharged under liner terms as per Clause 8 & 9, it shall be loaded,
105    stowed, secured or spout/dump/machine trimmed and discharged free of risk to the Vessel and to the Master's
106    satisfaction in respect of seaworthiness. Stevedores at loading and discharging ports are to be appointed and paid
107    for by Shipper(s), Receiver(s) or Charterer and shall work under the supervision of the Master.

108    If it is required by the custom of the port, the Vessel's crew shall operate free of expense to Charterer the Vessel's
109    cargo gear, if fitted, to load and unload mechanical equipment used in bulk cargo operations. If Charterer requires
110    it and local regulations permit, crew are to carry out cargo handling operations.

111    18.    Lighterage
112    Charterer has the option to load from barges sent alongside and/or discharge into barges sent alongside.
113    Lighterage, if any, shall be at Charterer's risk and expense, including such fendering necessary for safe
114    Operations, withfendering always to be to Masters satisfaction to avoid damage to the vessel.

115    19.    Hold Cleanliness
116    At the loading port(s) the Vessel's holds shall be suitable in all respects (owners are not allowed to nominate /

117 *use combination carriers under this cas(which-shall-include-a-gas-free-certificate)]*
118 the Vessel is a combination carrier) to receive the cargo to be loaded under this Contract to the satisfaction of an
119 independent surveyor and/or such recognized local authority as the regulations or Shippers may require. If the
120 Vessel's holds are found to be unsuitable, any time lost until the Vessel is accepted and is ready in all respects us
121 if the Vessel has not originally been rejected to load, shall not count as laytime or as time on demurrage. Any
122 expenses directly attributable thereto including but not limited to standby of trucks, labour and mechanical
      equipment shall be for Owner's account.

123  20.  **Hold Accessibility**
124        Vessel's holds and tank tops shall be suitable for the utilisation of grabs and any other mechanical equipment
125        used in loading and discharging operations. No cargo shall be loaded in any space which is inaccessible or
126        unsuitable for such equipment.

127  21.  **Lighting**
128        The Vessel shall give, free of expense to Charterer, full use of her lighting on deck and in the cargo compartments
129        which shall be adequate for all cargo operations.

130  22.  **Vessel Deficiencies**
131        In the event of a deficiency affecting the Vessel's ability to ballast and de-ballast or any other equipment, required
132        for the loading and discharging operations, any time lost not to count as laytime or time on demurrage. All *direct
      *and defined costs*
135        and expenses incurred as a result of any such deficiency shall be for Owner's account.

134  23.  **Trading Certificates**
135        Owner undertakes as a condition that throughout the term of this Contract the Vessel shall be in all respects
136        eligible under applicable conventions, laws and regulations for trading/entry to the ports and places as specified
137        in this Contract and that at all times the Vessel shall have on board for inspection by the appropriate authorities all
138        certificates, reports, records, compliance letters and other documents required for such services, including but not
139        limited to certificates of financial responsibility for pollution.

140  24.  **International & Local Regulations**
141        The Vessel shall comply with all applicable international and local laws and regulations, at any port of call under
142        this Charter Party. All time lost by reason of the relevant authority declaring the Vessel to be in non-compliance
143        with any of the afore mentioned shall not count as laytime or as time on demurrage and any expenses directly
144        attributable thereto including but not limited to standby of trucks, labour and mechanical equipment shall be for
145        Owner's account.

146  25.  **Restrictions, Routeing & Rotation**
147        The Vessel shall proceed to the first or sole discharging port via the most direct route unless otherwise agreed.
148        Loading and discharging port(s) rotation shall be in Owner's option, unless otherwise agreed.

149        Prior to arrival at loading and discharging port(s) Owner and Master to be solely responsible to determine the
150        applicable size, draft, length, beam and air draft limitations and any other restrictions.

151  26.  **Transfer**
152        Charterer shall have the privilege of transferring part or whole of this Contract to others, guaranteeing to Owner
153        due fulfilment of this Contract.

154  27.  **Notices**
155        Owner or Master shall tender 20/18/15/10 day approximate notices, followed by 7/6/3/2/1 days definite notices of
156        Vessel's expected time of arrival (ETA) at the loading port(s) to the agents and Charterer.

157        Owner or Master shall tender 20/18/15/10 days approximate notices, followed by 7/6/3/2/1 days definite notices of
158        Vessel's expected time of arrival (ETA) at the discharge port(s) to the agents and Charterer.

159        Charterer is to be kept advised of any alteration in the Vessel's expected readiness to load or discharge.

160        Should Owner and/or Master fail to give any of the definite notices, then 24 hours shall be added to the allowed
161        laytime for each failure by Owner and the Master to do so.

162  28.  **Agents**
163        The Vessel shall be consigned to Charterer's nominated agents as specified in Box 20 at load port and Box 21 at
164        discharge port, unless otherwise agreed, Owner paying customary fees.

165  29.  **Draft Survey**
166        If a draft survey is required to establish the Bill of Lading weight as per Clause 5, Charterer, Shipper(s) and/or
167        Receiver(s) shall appoint and pay for the surveyor. Time used for the draft survey shall neither count as laytime
168        nor time on demurrage.  *Should the draft survey be at the request of the vessel / master then all time shall not
      count as laytime nor time on demurrage.*

169        While the surveyor is taking draft readings and/or tank soundings, Master is not to take on board or pump ballast
170        at load and discharge ports without obtaining permission from Charterer, and Vessel is not to take on, release or
171        switch from one tank or other compartments to another any ballast, fresh water or fuel oil.

172  30.  Non-presentation of Bills of Lading
173       If requested by Charterer, the Master shall release all or part of the cargo at the discharging port(s) without
174       presentation of original Bills of Lading. Prior to discharge Charterer shall provide Owner a Letter of Indemnity as
175       per Owner's P&I club form but without a bank guarantee. Such Letter of Indemnity shall automatically become null
176       and void and to be promptly returned to Charterer upon presentation of the original Bill of Lading to Owner or
177       Master.

178  31.  Change of Ownership/Management
179       The Vessel shall not change ownership, flag, class, technical and/or crew management ("a change") during the
180       currency of this voyage without Charterer's prior approval which shall not be withheld unreasonably.

181       If and when a request to approve a change is received from Owner, the proposed new Owner and/or managers
182       shall be assessed by Charterer's vetting officer prior to Charterer's approval being granted.

183  32.  ITF and Boycott
184       Owner undertakes as a condition that the present terms and conditions of employment of the crew comply with an
185       ITF Agreement or a bona fide Trade Union Agreement that is acceptable to the ITF and their representatives and
186       will remain so for the duration of this Contract. In the event of loss of time and/or extra expenses incurred due to
187       boycott of the Vessel (whether actual or threatened) and/or dispute with labour because of the Vessel's flag or
188       nationality of Owner, Master, Officers or crew are employed, such time shall neither count as laytime nor time on
189       demurrage and such extra expenses shall be for Owner's account.

190  33.  Strike Clause
191       Time lost in loading and/or discharging by reason of any of the following causes shall neither count as laytime nor
192       time on demurrage: strikes, lockouts or stoppages of personnel connected with mining, production, port or facility
193       services or any Transport and/or handling of the cargo whether inland or at the port or facility. Furthermore,
194       Charterer, Shipper(s) and/or Receiver(s) shall not be liable or otherwise responsible for delays in loading and/or
195       discharging the Vessel if prevented by any of the foregoing causes.

196       If there is a strike, lockout or stoppage, as defined above, at the loading port or facility prior to the Vessel's arrival
197       there, Owner may request from Charterer a declaration as to whether Charterer agrees to maintain the voyage
198       calculating laytime as if there were no strike, lockout or stoppage. If Charterer has not made such a declaration
199       within 48 hours (excluding weekends) of such request, Owner then has the option of cancelling the voyage without
200       any liability to Owner or Charterer.

201       Owner shall have the liberty to sail from a loading port or loading facility affected by strike, lockout or stoppage as
202       defined above, without the cargo or sail with any cargo forming part of the intended shipment on expiry of 48
203       hours' notice of Owner's intention to do so which in any case shall not be disclosed by Owner until at least 72 hours
204       have elapsed since the Vessel's arrival at or off the port or facility so affected. Owner's 48-hour notice shall be
205       invalidated by the cessation of the strike, lockout or stoppage within this notice period. If the Vessel sails with part
206       of the intended shipment Charterer shall pay freight only on the cargo quantity actually loaded and Owner shall
207       have liberty to complete with other cargo en-route for their own account.

208  34.  Force Majeure
209       Subject to Ice Clause, Owner shall not be liable to Charterer, nor will Charterer be liable to Owner, for any delay or
210       failure in the performance of obligations hereunder, if such failure or delay is due to or results from an act of war or
211       the anticipated imminence thereof; restraints of rulers, governments, or peoples; act of terrorism; logistation,
212       decrees, orders, regulations or the like in the country of origin or of Vessel's flag; blockade, sanctions, civil
213       commotion, political disturbances, breakdowns, accidents, or stoppages whether total or partial, at ports, on
214       railways, or other means of transport to or from the ports; epidemics; quarantines; Act of God; weather (including
215       drought, fog, frosts, floods, snow, storms, tempest or washaways) or any other event or occurrence of any nature
216       or kind whatsoever beyond the reasonable control of Owner and/or Charterer or, in connection with Charterer, any
217       financial impecuniosities of Charterer's intended buyers or other related default(s). In circumstances where, if
218       relevant, alternative cargo(es) are not (in Charterer's discretion) commercially attainable.

219       The party whose performance of any obligation is directly affected, or who has reason to believe such
220       performance may be affected, by reason of any of the causes referred to above shall, as promptly as possible,
221       give notice thereof to the other party concerned in writing, and shall also within ten (10) days thereafter notify the
222       other party concerned, in writing, of particulars of the relevant event and supply supporting evidence.

223       Should any of the circumstances detailed above lead to delays up to fifteen (15) days in duration, for any of the
224       contracted cargo(es), then either Charterer or Owner, shall take reasonable steps to make good and resume with
225       the least possible delay, compliant with their obligations under this Contract.

226       Should any of the circumstances detailed above lead to delays in excess of fifteen (15) days, for any of the
227       contracted cargo(es), then either Charterer or Owner, shall have the right to cancel this Contract with fifteen (15)
228       days written notice, without liability to either party; alternatively by mutual agreement, this Contract shall be
229       suspended for the period so affected and Owner and Charterer shall negotiate and so decide whether terms of this
230       Contract shall be extended beyond the original term by the period of suspension hereof.

231       If the cumulative Force Majeure events in any contract year total more than thirty (30) days, Charterer shall have
232       this right to reduce the contractual number of shipments to be performed in that contractual year.

233  35.  Taxes and Dues
234       Owner shall pay all dues, charges and taxes customarily levied on the Vessel (including any income or freight tax

235
236   applicable at loading port(s) or country, howsoever the amount thereof may be assessed, as well as taxes levied
237   on the freight. Charterer shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever
238   the amount thereof may be assessed. Owner shall pay all canal, lock, seaway and any other river or waterway
      tolls, dues and charges, howsoever the amount thereof is assessed.

239   36.   Extra Insurance
240         Extra insurance on the Vessel and/or cargo on account of the Vessel's ownership, flag, classification, or age to be
241         for Owner's account. Charterer may elect to deduct extra insurance on the cargo from payment of freight, in which
242         case Charterer shall furnish evidence of payment in support of such deduction.

243   37.   Stevedore damage
244         At loading and discharging ports, any stevedore damage to the ship shall be settled between Owner and
245         Stevedore(s). However, Charterer shall render all reasonable assistance to Owner in the pursuit of their claim
246         against the Stevedore(s) for settlement of damage to the Vessel caused by the Stevedore(s).

247   38.   Drydocking
248         The Vessel shall not be dry-docked during the currency of this Contract except in case of emergency.

249   39.   Deviation
250         The Vessel shall have the liberty to deviate for the purpose of saving life or property, with leave to sail without
251         pilots, tow or to be towed and assist Vessels or to be assisted. Salvage shall be for Owner's sole benefit.

252   40.   Bunkering
253         The Vessel shall have liberty as part of the contract voyage to proceed to any port or ports at which fuel is
254         available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off
255         the direct and/or customary route or routes between any of the loading or discharging ports named in this
256         Contract, and may there take fuel in any quantity in the discretion of Owner even to the full capacity of the fuel
257         tanks and deep tanks or any other compartment in which fuel can be carried, whether such amount is required or
258         is not for the Chartered voyage.

259   41.   Lien & Cesser
260         All liability of Charterer shall cease on completion of loading except for payment of freight, deadfreight and/or
261         demurrage. Owner has a lien on cargo for freight, deadfreight and/or demurrage.

262   42.   Protection & Indemnity (P&I) Cover and Hull & Machinery Insurance.
263         Owner undertakes as a condition that the Vessel is entered with a P&I Club for full coverage and that the Vessel's
264         hull and machinery is fully insured and shall remain so for the duration of this Charter Party.

265   43.   Pollution Indemnity
266         Owner agrees to Indemnify Charterer, their agents, or any other party against any liabilities which may be imposed
267         on them or which they may incur under any statute regarding liability for pollution of waters by all or other
268         substances, by reason of any contravention of such statute by the Vessel, the Master or any servant or agent of
269         Owner provided that such contravention shall not have been caused or contributed to by the party seeking to be
270         indemnified under this Contract. Owner undertakes as a condition that the Vessel is entered in a P&I Club with
271         cover for liabilities arising out of any contravention as aforesaid. Laytime shall not count nor shall demurrage
272         accrue for any time lost through non-conformity with the above.

273   44.   Health and Safety
274         Owner shall have on board the Vessel an effective occupational health and safety policy with the objective that
275         due care and attention is given to crew members to safe working practices in all operations pertaining to the
276         Vessel. Owner shall have a policy regarding drug and alcohol abuse onboard the Vessel with the objective that no
277         crew member will navigate the Vessel or operate its onboard equipment whilst impaired by drugs or alcohol. The
278         policy will also have the objective of strictly prohibiting the possession, use, transport and distribution of illicit or
279         non-prescribed drugs by crew members. Owner shall exercise due diligence throughout the currency of this
280         Contract to ensure that such policies are complied with.

281   45.   Inspection
282         Charterer or their representative shall be allowed with masters permission which is not to be unreasonably
              withheld to inspect the Vessel in port at any reasonable time provided that
283         loading or discharging operations are not affected. This inspection will be to assess the Vessel's quality of
284         maintenance and other operational standards. Master and crew shall extend all reasonable assistance and co-
285         operation to Charterer or their representative. Upon request, Owner/Master to make available the Vessel's logs for
286         inspection by Charterer or their representative.

287   46.   Bimco ISM Clause
288         Owner shall procure that both the Vessel and "the Company" (as defined by the International Safety Management
289         Code [ISM Code]) shall comply fully with the requirements of the ISM Code where applicable during the currency of
290         this Contract. Upon request the Owner shall provide a copy of the relevant Document of Compliance (DOC) and
291         Safety Management Certificate (SMC) to Charterer.

292         Except as otherwise provided in this Contract, loss, damage, expense or delay caused by failure on the part of
293         Owner or "the Company" to comply with the ISM Code shall be for Owner's account.

294   47.   ISPS Clause for Voyage Charter Parties

8

285     (a)  (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities
286     And the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, Owner shall
287     procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the
288     requirements of the ISPS Code relating to the Vessel and "the Company". Upon request Owner shall provide
289     a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security
300     Certificate) to Charterers. Owner shall provide Charterers with the full style contact details of the Company
301     Security Officer (CSO).
302     (ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding
303     consequential loss, caused by failure on the part of Owner or "the Company" to comply with the requirements of
304     the ISPS Code or this Clause shall be for Owner's account.
305     (b)  (i) Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact
306     details and any other information Owner require to comply with the ISPS Code.
307     (ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss,
308     caused by failure on the part of Charterers to comply with this Clause shall be for Charterer's account and any
309     delay caused by such failure shall be compensated at the demurrage rate.

310     (c) Provided that the delay is not caused by Owner's failure to comply with their obligations under the ISPS Code,
311     the following shall apply:
312     (i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to
313     tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed
314     by a port facility or any relevant authority under the ISPS Code.
315     (ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS
316     Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs
317     before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by
318     Charterers at the demurrage rate.

319     (d) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses
320     whatsoever solely arising out of or related to security regulations or measures required by the port facility or any
321     relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services,
322     tug escorts, port security fees or taxes and inspections, shall be for Charterer's account, unless such costs or
323     expenses result solely from Owner's negligence. All measures required by Owner to comply with the Ship Security
324     Plan shall be for Owner's account.

325     (e)  If either party makes any payment which is for the other party's account according to this Clause, the other
326     party shall indemnify the paying party.

327   48.   U.S. Customs Advance Notification/AMS Clause for Voyage Charter Parties
328     (a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, Owner shall
329     comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall
330     undertake the role of carrier for the purpose of such regulations and shall, in their own name, time and
331     expense:
332     i) Have in place a SCAC (Standard Carrier Alpha Code);
333     ii) Have in place an ICB (International Carrier Bond); and
334     iii) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs.

335     (b)  Charterers shall provide all necessary information to Owner and/or their agents to enable Owner to submit a
336     timely and accurate cargo declaration.
337     Charterers shall assume liability for and shall indemnify, defend and hold harmless Owner against any loss
338     and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties
339     and all other claims of whatsoever nature, including but not limited to legal costs, arising from Charterer's failure to
340     comply with any of the provisions of this Sub-Clause. Should such failure result in any delay then, notwithstanding
341     any provision in this Charter Party to the contrary, all time used or lost shall count as laytime or, if the Vessel is
342     already on demurrage, time on demurrage.

343     (c)  Owner shall assume liability for and shall indemnify, defend and hold harmless Charterers against any loss
344     and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and
345     all other claims of whatsoever nature, including but not limited to legal costs, arising from Owner's failure to
346     comply with any of the provisions of Sub-Clause (a). Should such failure result in any delay then, notwithstanding
347     any provision in this Charter Party to the contrary, all time used or lost shall not count as laytime or, if the Vessel is
348     already on demurrage, time on demurrage.

349     (d)  The assumption of the role of carrier by Owner pursuant to this Clause and for the purpose of the US
350     Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of
351     Lading, other contract, law or regulation.

352   49.   Protective Clauses
353     Clause 50 to 53 inclusive shall also be deemed to be incorporated into this Contract and all Bills of Lading issued
354     hereunder.

355   50.   Clause Paramount
356     This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United
357     States, the Hague Rules, the Hague-Visby Rules or the Hamburg Rules, as compulsorily applicable, or such other
358     similar national legislation as may apply by virtue of origin or destination of the Bills of Lading, which shall be
359     deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any

360   of its rights or immunities or an increase of any of its responsibilities or liabilities under said applicable Act. If any
361   term of this Bill of Lading be repugnant to said applicable Act to any extent, such term shall be void to that extent,
362   but no further."

363   And

364   61.   **Both to Blame Collision**
365   "If the ship comes into collision with another ship as a result of the negligence of the other ship and any act,
365   neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management
367   of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the
368   other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any
369   claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to
370   the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as
371   part of their claim against the carrying ship or carrier.

372   The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects
373   other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

374   And

375   62.   **New Jason**
376   "In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting
377   from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the
378   carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the
379   goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of
380   a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in
381   respect of the goods.

382   If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship or ships
383   belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated
384   contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods,
385   shippers, consignees or owners of the goods to the carrier before delivery."

386   63.   **"Voywar 93" Clause**
387   (1) For the purpose of this Clause, the words:

388   (a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other
389   Operators who are charged with the management of the Vessel, and the Master and

390   (b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities,
391   revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of
392   piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or
393   imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise
394   howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in
395   the reasonable judgement of the Master and/or Owners, may be dangerous or are likely to be or to become
396   dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

397   (2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the
398   Master and/or Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to
399   expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, Owners may give notice
400   to Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may
401   be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided
402   always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports,
403   and at the port or ports nominated by Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel
404   may be exposed, or may be likely to be exposed, to War Risks, Owners shall first require Charterers to nominate
405   any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of
406   Carriage if Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such
407   requirement.

408   (3) Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or
409   place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or
410   Waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of
411   the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed,
412   that, in the reasonable judgement of the Master and/or Owners, the Vessel, her cargo (or any part thereof), crew or
413   other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks.
414   If it should so appear, Owners may by notice request Charterers to nominate a safe port for the discharge of the
415   cargo or any part thereof, and if within 48 hours of the receipt of such notice, Charterers shall not have nominated
416   such a port, Owners may discharge the cargo at any safe port of their choice (including the port of loading) in
417   Complete fulfilment of the Contract of Carriage. Owners shall be entitled to recover from Charterers the extra
418   expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the
419   full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100
420   miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage
421   which the extra distance represents to the distance of the normal and customary route. Owners having a lien on
422   the cargo for such expenses and freight.

423
424
425
426
427
428
429
430

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, Owners shall give notice to Charterers that this route will be taken. In this event Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

431
432
433
434
435
436
437
438
439
440
441
442
443
444
445
446
447
448
449

(5) The Vessel shall have liberty:-
(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;
(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the Authority to give the same under the terms of the war risks insurance;
(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;
(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;
(f) where cargo has not been loaded or has been discharged by Owners under any provisions of this Clause, to load other cargo for Owner's own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

450
451
452

(g)    If in compliance with any of the provisions of Sub-Clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

453   54.   General Average
454
455

Any General Average occurring under this Contract is to be adjusted, stated and settled in London according to York-Antwerp Rules 1994 and any subsequent amendments thereto, according to English law and practice.

456   55.   ~~Japanese Trading Clause~~
457
458
459
460
461

~~Owner undertakes as a condition that the Vessel shall have on board a valid International Group of P&I Clubs certificate of insurance issued by MOLIT (Ministry of Land Infrastructure and Transport (departs) so required under Japanese law. Owner shall ensure full compliance with all Japanese reporting obligations required under Japanese law. Further and without prejudice to Charter's other legal rights, Owner shall indemnify Charterer against all consequences arising out of non-compliance with this provision.~~

462   56.   Ice Clause
463
464

The Vessel shall not be obliged to force ice but, subject to Owner's approval and having due regard to its size, construction and class, may follow ice-breakers when reasonably required.

465

(a) Port of Loading

466
467
468
469
470
471
472
473
474
475
476
477
478

(i) If at any time after sailing out on the approach voyage the Vessel's passage is impeded by ice, or if on arrival the loading port is inaccessible by reason of ice, the Master or Owner shall notify Charterers thereof and request them to nominate a safe and accessible alternative port.
If Charterers fail within 48 running hours, Sundays and holidays included, to make such nomination or agree to reckon laytime as if the port named in the contract were accessible or declare that they cancel this Charter Party, Owner shall have the option of cancelling this Charter Party.
(ii) If at any loading port the Master considers that there is a danger of the Vessel being frozen in, and provided that the Master or Owner immediately notify Charterers thereof, the Vessel may leave with cargo loaded on board and proceed to the nearest safe and ice free place and there await Charterer's nomination of a safe and accessible alternative port within 24 running hours, Sundays and holidays excluded, of the Master's or Owner's notification. If Charterers fail to nominate such alternative port, the Vessel may proceed to any port(s), whether or not on the customary route for the chartered voyage, to complete with cargo for Owner's account.

479

(b) Port of Discharge

480
481
482
483
484
485
486
487
488

(i) If the voyage to the discharging port is impeded by ice, or if on arrival the discharging port is inaccessible by reason of ice, the Master or Owner shall notify Charterers thereof. In such case, Charterers shall have the option of keeping the Vessel waiting until the port is accessible against paying compensation in an amount equivalent to the rate of demurrage or of ordering the Vessel to a safe and accessible alternative port.
If Charterers fail to make such declaration within 48 running hours, Sundays and holidays included, the Master or Owner having given notice to Charterers, the Master may proceed without further notice to the nearest safe and accessible port and there discharge the cargo.
(ii) If at any discharging port the Master considers that there is a danger of the Vessel being frozen in, and provided that the Master or Owner immediately notify Charterers thereof, the Vessel may leave with cargo

9

488    remaining on board and proceed to the nearest safe and ice free place and there await Charterer's nomination of a
489    safe and accessible alternative port within 24 running hours, Sundays and holidays excluded, of the Master's or
490    Owner's notification. If Charterers fail to nominate such alternative port, the Vessel may proceed to the nearest
491    safe and accessible port and there discharge the remaining cargo.
492    (iii) On delivery of the cargo other than at the port(s) named in the contract, all conditions of the Bill of Lading
493    shall apply and the Vessel shall receive the same freight as if discharge had been at the original port(s) of
494    destination, except that if the distance of the substituted port(s) exceeds 100 nautical miles, the freight on the
495    cargo delivered at the substituted port(s) shall be increased proportionately.
496

497   **57.**  **Dispute Resolution**
498    This Contract shall be governed by and construed in accordance with English law. Should the parties fail to reach
499    a prompt amicable settlement (and without prejudice to either party's rights to obtain urgent judicial relief), the
500    parties hereby agree to refer all disputes to mediation. Unless the parties agree forthwith on the appointment of a
501    mediator, the parties hereby agree that the Honorary Secretary of the London Maritime Arbitrators Association, on
502    request of either party, is to appoint a mediator.

503    In the event that mediation is either rejected by one party or does not lead to a resolution within twenty-one days,
504    following the appointment of a mediator (unless the period is mutually extended), any dispute shall be resolved by
505    London arbitration as provided below.

506    (1) All disputes arising out of or relating to this Contract where the total amount claimed (excluding interest and
507    costs) by either party does not exceed US$75,000 - shall be referred to arbitration in London and that reference
508    shall be in accordance with the LMAA Small Claims Procedure.

509    (2)  All other disputes, unless the parties agree forthwith on a single arbitrator, shall be referred to the final
510    arbitration of two arbitrators carrying on business in England who shall be members of the Baltic
511    Exchange and engaged in shipping and/or grain trades, one to be appointed by each of the parties
512    with the power to such arbitrators to appoint an umpire.

513    All claims under this Contract must be made in writing and any arbitration commenced within one year of final
514    discharge and where this provision is not complied with the claim(s) shall be deemed to be waived and absolutely
515    barred. No arbitral award shall be questioned or invalidated on the ground that any of the arbitrators is not qualified
516    as above unless objection to his acting is taken within seven days of the appointment.

517    The parties are entitled, at any stage, to commence arbitration (so as to preserve time) notwithstanding ongoing
518    amicable negotiation or mediation.

519   **58.**  **Cargo Survey**
520    ~~If required the steel products or manufactured or packaged cargo only a preshipment and an outturn survey shall~~
521    ~~be carried out by surveyors mutually agreed between Owners and Charterers with the costs shared equally.~~
        *All time and costs for preload vessel inspections for Owners account.*

522   **59.**  **Part Cargo**
523    If part cargo is allowed, Owners may tender Notice of Readiness in accordance with the provisions of this Charter
524    Party, notwithstanding that other part cargo(es) may be loaded or discharged first, time used for the loading or
525    discharging of other part cargo(es) shall not count as laytime or as time on demurrage under this Charter Party.
526    Any time used in shifting between the different berths for loading or discharging of part cargo(es) shall not count
527    as laytime or as time on demurrage.

528   **60.**  **Commissions**
529    An address commission as stated in Box 22 on the gross amount of freight, deadfreight and/or demurrage shall be
530    deducted by Charterer upon payment of same. Brokerage as stated in Box 23 on the freight, deadfreight and/or
531    demurrage shall be due to the broker named in Box 23 upon payment of same and is payable by Owner.

532   **61.**  **Termination on Bankruptcy of Either Chartering Party**
533    The following provision shall apply to this Charter Party only if there is not in force between the parties an effective
534    netting agreement in respect of all outstanding Transactions (as defined below) between them. The provision shall
535    not apply to, or be incorporated into, any Bill of Lading.

536    (a) The parties to this Charter Party agree that if at any time a Bankruptcy Event (as defined below) occurs in
537    relation to either of them (the "Defaulting Party"), the other party (the "Non-Defaulting Party") may by not more than
538    20 days' notice to the Defaulting Party designate a close-out date in respect of all Transactions then outstanding
539    between them on which the process set out in paragraph (b) shall occur (subject to paragraph (c)
540    below).

541    (b) As of the close-out date (i) all performance obligations of the parties under outstanding Transactions shall
542    terminate (ii) the Non-Defaulting Party shall promptly calculate its Loss (as described below) in respect of each
543    Transaction (iii) the Losses so calculated shall be aggregated and netted to the greatest extent possible (and, in
544    order to effect this, the Non-Defaulting Party may convert any such Losses at commercially reasonable rates into
545    such currency as may be required) and (iv) the net resulting amount, if positive, shall be paid by the Defaulting
546    Party to the Non-Defaulting Party within 5 days of the close-out date. If the net resulting amount is negative, no
547    amount shall be due from or payable by either party to the other. Interest on the net resulting amount shall accrue
548    at the rate of overnight LIBOR plus 3% if such amount is not paid when due.

549    (c) A close-out date (as described above) shall occur automatically as of the time immediately before the start of

16

550  a Bankruptcy Event specified in paragraph (1), (3), (4), (5), (6) or, to the extent analogous, (8) of that
551  definition.

552  (d) The parties to this Charter Party acknowledge and agree that the Transactions between them form a single
553  agreement and have entered into the Transactions on this basis.

554  **52.  Set-off**
555  Following a default by either party hereunder (the "Defaulting Party") the other party (the "Non-defaulting Party")
556  shall be entitled, at its option, to set-off any amounts believed in good faith and on reasonable grounds by the
557  Non-defaulting Party to be payable (whether at such time or in the future or upon the occurrence of a contingency)
558  by the Defaulting Party to the Non-defaulting Party (whether under this Contract or otherwise), against any
559  amounts believed in good faith and on reasonable grounds by the Non-defaulting Party to be payable (whether at
560  such time or in the future or upon the occurrence of a contingency) by the Non-Defaulting Party to the Defaulting
561  Party (whether under this Contract or otherwise), irrespective of the currency, place of payment or booking office
562  of either party's obligations and the parties' respective obligations shall be discharged promptly and in all respects
563  to the extent they are so set-off. The Non-defaulting Party will give 3 (three) days prior notice to the Defaulting
564  Party of any intended set-off to be effected under this provision. For this purpose, any such amount payable by
565  one party to the other (or the relevant portion of such amount) may be converted by the Non-defaulting Party,
566  acting in good faith and in a commercially reasonable manner, into such currency as may reasonably be required
567  in order to effect such set-off at an exchange rate determined by the Non-defaulting Party acting in good faith and
568  in a commercially reasonable manner. If an obligation is unascertained, the Non-defaulting Party may in good faith
569  estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other
570  when the obligation is ascertained. The right of the Non-defaulting Party under this provision shall apply without
571  prejudice to Clause 51 or any other right of set-off which it may have whether by agreement, operation of law or
572  otherwise. Nothing in this provision shall be effective to create a charge or other security interest.

573  **53.  Attachments**
574  The BHP Billiton Vetting questionnaire duly completed by Owner for the performing vessel, Appendices A, B, C
575  and Rider Clauses ..... to ..... as attached are deemed to be fully incorporated in the Contract and to form part of
576  it.

577  OWNER: _____               CHARTERER: _____

*For and on behalf of*                 For and on behalf of
Jebsens Trans-Pacific Shipping         BHPB FREIGHT PTY LTD
Services AS Bergen

JEBSENS INTERNATIONAL (AUSTRALIA) PTY LTD
AS AGENTS ONLY

## Appendix A

### VESSEL'S DESCRIPTION AND OTHER DETAILS

Name: _____

Previous Names: _____

Callsign/Telex/Fax/Inmarsat numbers: _____

Type of Vessel: _____

Date of Build: _____ Shipyard where built _____ Flag: _____

Classed _____ at ;

DWAT: _____ on _____ summer salt water draft

LOA: _____ Beam : _____ moulded Depth

TPC/TPI : _____

Number of holds & hatches : _____

Vessel's Ballast holds (sea/port): _____

Airdraft (Distance from waterline to top of hatch coaming) in

Normal Ballast condition: _____

Fully Laden condition: _____

Type of Hatchcovers: _____

Hatch dimensions in main deck (and tween deck if applicable): _____

P&I Club and current Hull & Machinery value: _____

Applicable to Handysize and geared Panamax Vessels:

Number & Type and manufacturer of cargo gear: _____

Capacity of gear under hook: _____

Is Vessel grabs fitted (yes/no): (if applicable type of grabs and capacity) : _____

Flat tanktop dimensions in metres: _____

Tanktop strength in metric tons per square metre: _____

Can Vessel's hold ladders be continually accessed from the holds between a

Height of 3-5 metres above the tanktop? _____

Grain and Bale Capacities total and per hold (OBM) (plus Hatchcoamings if

Capesize/Panamax/OBO/Orecarrier) : _____

Normal Operating speeds in ballast and laden: _____

Applicable to Very Large, Capesize and Panamax Bulkcarriers, Orecarriers and OBOs.

Dunkirk East Suitable: Yes/No

Redcar suitable! Yes/No

Vessel is/is not described as being self trimming

12

## Appendix B

| Banking Details | |
|---|---|
| Beneficiary's Name | |
| Address | |
| Post Code | |
| City | |
| Country | |
| Account Number (USD Acct) | |
| Beneficiary Bank | |
| Address | |
| Postal Code | |
| City | |
| Country | |
| Sort Code/ABA etc | |
| Swift Code | |
| | |
| Intermediate Bank | |
| Address | |
| Post Code | |
| City | |
| Country | |
| Sort Code/ABA etc | |
| Swift Code | |

## Appendix C

### Defined Terms

In Clause 61 of this Contract:

"Bankruptcy Event" shall have the meaning set out in Section 5(a)(vii) of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) as published by the International Swaps and Derivatives Association, Inc. and shall apply in relation to either party, or any entity (other than a bank) providing a guarantee, cash or other collateral or credit enhancement in support of that party's obligations to the other party under one or more Transactions.

"Loss" means the amount that the Non-Defaulting Party reasonably determines in good faith to be its losses and costs (or gain, in which case expressed as a negative number) in connection with the termination of the Transaction. Loss shall include the value of any and all amounts payable or required to be delivered to either party in respect of the Transaction, but unpaid or undelivered (as the case may be). Loss may, in the reasonable discretion of the Non-Defaulting Party, include all or any of the following, without duplication: (i) any loss of bargain (ii) cost of funding (iii) loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any related trading position (or any gain resulting from any of them). The Non-Defaulting Party may calculate Loss by reference to (aa) the quotations (whether firm or indicative) of relevant prices or rates from leading independent participants in the relevant markets that may take into account the creditworthiness of the Non-Defaulting Party and any other relevant factors or (bb) relevant market data and information (including price models) whether derived from external or internal sources. The same valuation method need not be used for all Transactions.

"Transaction" means any physically or cash-settled trade or agreement (including any master agreement where the parties so allow and any option) between the parties in respect of freight, hire, coal, any precious or non-precious metal, oil or any related product, natural gas, electricity, emissions allowances or green credits, any weather factor or any other commodities or products similar to any of the foregoing.

14

EXHIBIT "2"

## Mary E. Fedorchak

**From:** Sowunmi, Kunbi [Kunbi.Sowunmi@bhpbilliton.com]
**Sent:** Wednesday, January 09, 2008 11:13 AM
**To:** Sowunmi, Kunbi
**Subject:** FW: Jebsens sulphur 2008 (option declared)

**From:** wendyr@jebsens.com.au [mailto:wendyr@jebsens.com.au]
**Sent:** Tuesday, August 14, 2007 7:27 AM
**To:** Handy Pacific Chartering
**Cc:** Handy Pacific Chartering; scallinan_moore@jebsens.com.au
**Subject:** RE: Jebsens sulphur 2008 (option declared)

Bruce

confirming receipt of chrtrs declaration to extend sulphur COA for further 12 months.

Sorry abt the time lapse,

thnks & rgds
Wendy

"Handy Pacific Chartering" <hpc@bhpbilliton.com>

14/08/2007 02:46 PM

To <scallinan_moore@jebsens.com.au>, <wendyr@jebsens.com.au>

cc "Handy Pacific Chartering" <hpc@bhpbilliton.com>

Subject RE: Jebsens sulphur 2008 (option declared)

Wendy/B,
Could you please give us your confirmation as per below ?
Thanks,.
BW

-----Original Message-----
From: Handy Pacific Chartering
Sent: Monday, 13 August 2007 10:14 AM
To: 'scallinan_moore@jebsens.com.au'; 'wendyr@jebsens.com.au'
Cc: Handy Pacific Chartering
Subject: Jebsens sulphur 2008 (option declared)
Importance: High

Wendy/B,
Pleased to confirm that Charterers declare further 12 months of this COA
(01-Jan-08 to 31-Dec-08).
Could Owners please re-confirm accordingly ?
Regards,
Bruce Elsworth

1/9/2008

BHPB Freight


-----Original Message-----
From: Randy Pacific Chartering
Sent: Tuesday, 29 August 2006 9:29 PM
To: 'eric.boissevain@jebsens.com.au'; 'scallinan_moore@jebsens.com.au';
'wendyr@jebsens.com.au'
Cc: Randy Pacific Chartering
Subject: Recap - Sulphur 2007 & 2008 Mainterms


Eric / Peter
We pleased to recap mainterms agreed so far as follows


a/C: BHPB Freight Pty Ltd for and On Behalf of BHP Billiton Marketing
Inc
Owners: Jebsens International, Melbourne, Australia


1. 6 months firm (1 January 2007 to 30 June 2007) with a further 6
months (1 July 2007 to 31 December 2007) in CHOPT to be declared by
April 1st 2007, with a further optional 1 year in CHOPT (1 January 2008
to 31 December 2008) which shall be declareable by October 1st. 2007.

2. Load port: Vancouver BC: 1 or 2 safe berth in Chopt(s), always afloat
or in Charterers option Port Moody; 1 or 2 safe berth(s), in Chopt
always afloat or in Charterers option Vancouver BC 1 safe berth and Port
Moody 1 safe berth in Chopt, always afloat.

3. Load terms: 12,000mt WWD SHINC, NOR ATDNSBTNC, 12HRS TT, USC ICATUTC

4. Discharge: 1 sb Esperance 8,000mt WWD SHINC, NOR ATDNSBTNC, 12HRS TT,
USC IUATUTC
(Comment: Townsville & Adelaide as per COA) Discharge port(s): in line
with agreement of point 2 above , the Charterparty wording for
discharge port should be amended as follows:


Townsville: 1 safe berth, always afloat
Adelaide: 1 safe berth, always afloat
Esperance: 1 safe berth, always afloat

Swios as per c/p Clause 4, DISCHARGING

5. For Esperance only liftings Charterers to give Owners 45 days notice
of required 7 day laycan.

6. Freight rates for firm period 1 Jan 07 to 30 Jun 07 & CHOPT optional
period 1 July 07 to 31 Dec 07


a) Owners and Charterers have agreed to apply the following freight
rates for the tonnage as per below:


Freight (basis free in/out)
USD$41.10 pmt for Townsville
USD$43.20 pmt for Adelaide
USD$43.19 pmt for Townsville & Adelaide
USD$49.10 pmt for Townsville & Esperance USD$49.10 pmt for Adelaide &
Esperance


Charterers have the option to declare Esperance only liftings:


15,000mt +/- 5 % CHOPT        USD$47.40 pmt
25,000mt +/- 5 % CHOPT        USD$44.75 pmt
28,000mt +/- 5 % CHOPT        USD$41.90 pmt



b) Owners have the liberty to use the following 3 vessels, with owners
to pay max London Lloyds over age premium:
- M.v. General Villa - gantry - built 1985
- M.v. General Delgado - gantry - built 1985
- M.v. Cielope - craned - built 1985

1/9/2008

Freight (basis free in/out)
USD539.13 pmt for Townsville
USD543.20 pmt for Adelaide
USD541.10 pmt for Townsville & Adelaide
USD547.10 pmt for Townsville & Esperance USD547.10 pmt for Adelaide & Esperance

7. Freight rates for optional period 1 Jan 08 to 31 Dec 08

a) Owners and Charterers have agreed to apply the following freight rates for the tonnage as per below:

Freight (basis free in/out)
USD542.53 pmt for Townsville
USD544.73 pmt for Adelaide
USD544.63 pmt for Townsville & Adelaide
USD550.65 pmt for Townsville & Esperance
USD550.65 pmt for Adeladie & Esperance

Charterers have the option to declare the option for Esperance only liftings:

15,000mt +/- 5 % CHOPT    USD548.95 pmt
25,000mt +/- 5 % CHOPT    USD545.95 pmt
25,000mt +/- 5 % CHOPT    USD543.45 pmt


b) Owners have the liberty to use the following 3 vessels, with owners to pay max London Lloyds over age premium
- M.v. General Villa - gantry - built 1985
- M.v. General Delgado - gantry - built 1985
- M.v. Ciclope - craned - built 1985


Freight (basis free in/out)
USD540.69 pmt for Townsville
USD542.75 pmt for Adelaide
USD542.66 pmt for Townsville & Adelaide
USD548.65 pmt for Townsville & Esperance
USD543.65 pmt for Adelaide & Esperance

-Shifting time between berths when third is required to continue or complete, loading or discharging cargo being carried under this COA to count as laytime.

-Charterer's Agents bends as per current COA dated 5th December 2006,

-Charterer's berth at discharge ports.

-Charterers shall provide a 6-month period tentative shipping schedule which to be tentatively updated on a monthly basis (as per current COA).


8. Sub Charterers BOD approval declareable by 17:00hrs Melbourne time Friday 1st September 2006

9. Otherwise as per current c.o.a dated 5th December 2006.

END


Regards

This message and any attached files may contain information that is confidential and/or subject of legal privilege intended only for use by the intended recipient. If you are not the intended recipient or the person responsible for delivering the message to the intended recipient, be advised that you have received this message in error and that any dissemination, copying or use of this message or attachment is strictly forbidden, as is the disclosure of the information therein. If you have received this message in error please notify the reader immediately and delete the message.

EXHIBIT "3"

# Jebsens Trans-Pacific
# Shipping Services AS

Sandbrugt 5
P.O. Box 3994, Dreggen
5835 Bergen, Norway

Telephone Number: (+47) 539 60 000
Fax Number: (+47) 530 50 051
Website: www.jebsens.com
Reg.no. 879416245- VAT

Mr. Niels Wage – Vice President
BHP Billiton Marketing B.V
Verheeskade 25, 2521 BE
P O Box 19511, 2500 CM
The Hague
The Netherlands

Bergen, 20 December 2007
BJ/mwj

Dear Mr. Wage,

I refer to my letter of 17 December and to your email of 18 December 2007.

I note your comments regarding the contractual commitments of JTSS. I have already made you aware of the factual circumstances which make it impossible for JTSS to perform the contracts on its current terms. These circumstances have not changed and JTSS therefore remains unable to meet the January nomination.

You make reference in your email to taking steps against a "parent company" of JTSS. Please note that JTSS is an independent corporate entity. Neither its shareholders nor any other corporate entity bears any responsibility for the debts of JTSS. Under the circumstances, there is simply no possibility of bringing a claim against a third party.

As to your comments concerning security, you should be aware that JTSS does not own any vessels. BHPB therefore has no right to arrest any vessels in connection with the alleged claim against JTSS. Any such arrest would be wrongful and all losses or expenses arising out of that arrest would be recoverable from BHPB.

Although I am aware that you continue to have reservations, I still feel that it would be beneficial for us to meet as soon as possible in The Hague to discuss these matters further in the hopes of finding a mutually acceptable way forward. I appreciate that reaching a commercial solution may require you to obtain some support from our shareholders. You may wish us to enter into a deal with more long term benefits for BHPB or to consider other possible arrangements. These are issues that might be discussed more easily in person.

We look forward to hearing from you.

Yours sincerely,
JEBSENS TRANS-PACIFIC SHIPPING SERVICES AS

Bjørn Jebsen

EXHIBIT "4"

# BHPB Freight Pty Ltd

# INVOICE

| JOAPJDFI CPV I |
| 41927636 |

JOAPJDFI UP, I  KFCTFCT USBOT! CBDJ GJDI TI JCOJ CHI TFSWIDFT
BT! CFSHFG- I CPSXBZI

| Ebuf | 13. KBQ. 3119 |
| Dvt upnf sI SI gI Cp/ I | |

Buuf ouj po    Bddpvout I Cbzbcnf I Ef qbsunf ou!

| Psj hj cbupa! SI gf sf oof I VBWBMK |

UFSNT; I Cm bt f I obz I oz! 09-JAN-2008

VFTTFM CBNF, I   CPTI MFBEFSI                VOY NO.  65453

GSFJHI UI EJ GGFSFCDF                                                    CSD

|  |  | Amount | Exchange Rate |
| GSFJHI UI EJ GGFSFCCF! TQPU ' CPB | | 2,058,300.00 USD 1.000 | |
| UPUBM | | III 3-169- 411/ 11! VTE | 2,058,300.00 |

UPUBM BNPVCU                ВНРВ Freight Pty Ltd                    2,058,300.00

2,058,300.00

For & on behalf of BHPB Freight Pty Ltd

Please pay by Telegraphic Transfer quoting invoice number 50216524  to:
BANK OF AMERICA N.A.
LONDON E14 5AQ, GREAT BRITAIN

For the credit of:
BHPB Freight Pty Ltd
Account Number 6008 65022015
SWIFT: BOFAGB22    IBAN: GB36 BOFA 1650 5065 0220 15

Please email remittance advice quoting Invoice no. & tt details to:

BHPB Freight Pty Ltd                    For queries regarding these
                                        charges pls contact:
                                        J Valaitis

ABN No. - 83 006 480 548

Status       DR

# EXHIBIT "5"

## FREIGHT DIFFERENTIAL

| | |
|---|---|
| Freight rate under the COA: | $42.65 |
| Freight rate for substitute vessel (POS LEADER): | $157.00 |
| Freight: | 18,000 mt |
| Difference in rates: | 157-42.65 =114.35 |
| Freight differential: | $114.4 x 18,000mt = 2,058,300.00 |